__ FILED    ___ ENTERED
____ LOGGED _____ RECEIVED

12:07 pm, Apr 19 2024

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

- - - - - - - - - - - - - - - x
                         :
JUSTYNA JENSEN,            :
                         :
        Plaintiff,      :       Civil No. 24-000273-BAH
    v.                   :
                         :
MARYLAND CANNABIS      :
ADMINISTRATION et al.,   :
                         :
        Defendants.     :       February 22, 2024
                         :
- - - - - - - - - - - - - - x      Baltimore, Maryland

**MOTIONS HEARING**

BEFORE:   THE HONORABLE BRENDAN A. HURSON, Judge

APPEARANCES:           JEFFREY JENSEN, ESQ.
                         Jeffrey M. Jensen, PC
                         9903 Santa Monica Boulevard
                         Beverly Hills, CA  90212
                           On Behalf of the Plaintiff

                         ALLEN HONICK, ESQ.
                         Furman Honick Law
                         11155 Red Run Boulevard, Suite 110
                         Owings Mills, MD  21117
                           On Behalf of the Plaintiff

                         HEATHER NELSON, ESQ.
                         JAMES TANSEY, ESQ.
                         Maryland Office of the Attorney
                          General
                         300 W. Preston Street, Suite 302
                         Baltimore, MD  21201
                           On Behalf of the Defendants

Audio Operator:         Rebecca Maldeis

Proceeding recorded by electronic sound recording, transcript produced by transcription service.

*CompuScribe*
*301-577-5882*

jj                                                                                                    2

```
Transcription Company:    CompuScribe
                          P.O. Box 789
                          Cheltenham, Maryland  20623-9998
                          (301) 577-5882
```

jj                                                                          3

## I N D E X

Page

Comments by Jeffrey Jensen, Esq.
Attorney for the Plaintiff                                            6

Comments by Heather Nelson, Esq.
Attorney for the Defendants                                          32

Rebuttal by Jeffrey Jensen, Esq.                                     53

KEYNOTE: "----" indicates indiscernible in the transcript.
        "*"   indicates phonetic spelling in the transcript.

1                          P R O C E E D I N G S

2              (Whereupon, at 10:02 a.m., the hearing began.)

3                  THE CLERK:  -- of Maryland is now in session.  The

4    Honorable Judge Brendan A. Hurson presiding.

5                  THE COURT:  Good morning, everybody.  Please be

6    seated.

7                  THE CLERK:  The matter now pending before this court

8    is civil docket number BAH-24-CV-273.  Justyna Jensen versus

9    Maryland Cannabis Administration, et al.  The matter now comes

10   before the Court for the purpose of a temporary restraining

11   order.

12                 Will Counsel for the Plaintiff please introduce

13   themselves for the record.

14                 MR. JENSEN:  Good morning, Your Honor.  Jeffrey

15   Jensen on behalf of the Plaintiff Justyna Jensen.

16                 THE COURT:  Good morning.

17                 MR. HONICK:  Good morning, Your Honor.  Allen Honick

18   on behalf of the Plaintiff as well.  Good morning.

19                 THE COURT:  Good morning.

20                 THE CLERK:  And will Counsel for the Defendants

21   please introduce themselves for the record.

22                 MS. NELSON:  Good morning, Your Honor.  Heather

23   Nelson for the State Defendants.

24                 THE COURT:  Good morning.

25                 MR. TANSEY:  Good morning, Your Honor.  James Tansey

1    on behalf of the Defendants.

2              THE COURT:  All right.  Well, good morning to you.

3    You can be seated.

4              All right.  So let me tell you what I have looked at

5    here.  I guess we are sort of at the preliminary junction

6    phase here given that everyone is here.  So I have looked at

7    honestly, the complaint, the ECF-19, the motion itself,

8    correspondence at ECF-20, ECF-25, which is your response in

9    opposition, and EFC-26, which is your reply.

10              The memo is sort of buried in the motion.  It was

11    like 19-6 or something like that.  So I certainly read that

12    and appreciated it, and some of the attachments.

13              From the perspective of Ms. Jensen, have I missed

14    anything that I should have read?

15              MR. JENSEN:  I do not believe so.

16              THE COURT:  Okay.  And, Defense, you think I missed

17    anything that I should have read that has been submitted or is

18    that everything on the docket that you are aware of?

19              MS. NELSON:  That is everything, Your Honor.

20              THE COURT:  Okay.

21              MR. JENSEN:  Your Honor, I am sorry to interrupt.

22    When you said you read the reply, I assume that includes the

23    declaration that Justyna submitted?

24              THE COURT:  Oh, absolutely.  Yes.  Everything

25    attached to it as well.  Yes, definitely.  Okay.

 1                So we have covered sort of the landscape, and it is

 2     a very interesting issue.  And stating the obvious, this has

 3     not come up, at least some of this in this circuit, so I

 4     appreciate everybody pointing me in the direction of other

 5     cases.  My goal here now is to -- the way I usually proceed is

 6     to give you some time to just summarize your argument if you

 7     want to, and then I will pepper you with some questions.

 8                Same with you.  I don't anticipate this taking more

 9     than an hour or so, but obviously, Mr. Jensen, it is your

10     motion, and it is your bar to meet.  So you can go first.

11                MR. JENSEN:  Thank you, Your Honor.  I would like to

12     just begin with the bottom line.  I feel confident that this

13     is going to be appealed either way and on an expedited basis

14     to the Fourt Circuit.  So I would ask the Court to consider

15     the balance of harms and put the injunction in place pending

16     the appeal.  I would ask you consider that they have not even

17     set a date for the lottery.  Their harm is going to be very

18     small by whatever delay waiting for the Fourth Circuit's

19     ruling.

20                Whereas, for the Plaintiff, once the licenses are

21     out there, I think it is unlikely the Court will recall them.

22     I have not seen a court do that yet under its equitable

23     powers.  In light of that, I would ask the Court to consider

24     putting the injunction in place.

25                I would also point out that the Fourth Circuit, in a

jj                                                                                 7

1    case cited by the Defendant, said that the Court is to

2    consider not only the harm of the Plaintiff before the Court

3    to interstate commerce, but the collective harm of the law on

4    the interstate commerce.  That is Colon Health Centers of

5    America versus Hazel, 733 F.3d 535.

6              And so when you consider that this law excludes

7    people who went to college in 49 of the 50 states, I think it

8    is a large burden that outweighs the state's burden of a

9    temporary delay, if they are successful, until the licenses

10   are issued.

11             As far as whether the Dormant Commerce Clause

12   applies, there is a split authority on that as I acknowledge

13   in the papers.  The only circuit to rule on it ruled that it

14   does apply.  No circuit to date, that I am aware of, has done

15   anything to indicate it doesn't.  The rulings from the other

16   circuits, the Second Circuit, Seventh Circuit, and that may be

17   it to date, would tend to indicate that they think it does

18   apply because they did not rule on that basis.

19             There is a fully briefed and submitted appeal to the

20   Ninth Circuit, and we are awaiting the ruling there.  I did

21   submit to the Court the YouTube link that shows the oral

22   argument and the --

23             THE COURT:  Yes.  I took you up on watching that.

24   It seemed almost entirely devoted to abstention.  You had

25   mentioned in your filing that they had -- and I want to make

1    sure I quote you right because I actually just wrote this

2    down.  You had mentioned that -- and you are talking about

3    that Peridot Tree v. Sacramento oral argument?

4              MR. JENSEN:  Correct.

5              THE COURT:  You had mentioned that the Ninth Circuit

6    also raised a question about the First Circuit case and

7    indicated the Ninth Circuit believes the First Circuit

8    majority was correct in concluding on the merits of the

9    Dormant Commerce Clause or concluding that the Dormant

10   Commerce Clause applies to cannabis.

11             Maybe I missed that.  I heard one question to the

12   State or the City saying were they wrong in Northeast Patients

13   Group.  Did I miss it?

14             MR. JENSEN:  Well, Your Honor, if the Court watched

15   the video, I am sure you will make your own decision.  My

16   interpretation of that was the judge said were they wrong, and

17   I think the State said, well, according to defense or

18   according --

19             THE COURT:  Right.  According to dissent.

20             MR. JENSEN:  Right.  And he said --

21             THE COURT:  And he said, well ask the dissent.

22             MR. JENSEN:  -- well ask the dissent when you go

23   out.  Right.  So, you know, I am not going to try to tell the

24   Court how to interpret the video that you watched with your

25   own eyes.  So, you know, I --

1            THE COURT:  So that is the portion that you are --

2            MR. JENSEN:  Correct.

3            THE COURT:  -- referring to?  Okay.

4            MR. JENSEN:  So I would point out along the lines of

5    what Your Honor just raised, of the cases that are cited by

6    the Defense that four of those cases come from the Ninth

7    Circuit.  Two of them are really duplicative.  They are both

8    from the Western District of Washington.

9            Then there are the two that go into abstention.  One

10   of the Peridot Tree that Your Honor watched.  There was also

11   one in Los Angeles called Variscite.  That just stayed the

12   case pending the resolution of the --

13           THE COURT:  And is that the one that addressed the

14   prior conviction for marijuana in California as a requirement

15   for a license?

16           MR. JENSEN:  It is.

17           THE COURT:  Okay.

18           MR. JENSEN:  And it is also -- that is notable one

19   other way.  That is the first court that said there is not an

20   irreparable harm by being excluded from a lottery if there is

21   going to be a later lottery.  That flies in the face of Finch

22   and Lowe, the precedent cases.  Finch being out of Illinois,

23   Lowe being out of Detroit.  The two precedent cases that

24   address that.

25           The Variscite Los Angeles case said that we never

1   appealed it because it was already on appeal through

2   Variscite.  And then the Defense in this case picked up on

3   that also in Washington.  But I would -- I put this in the

4   brief.  I just ask Your Honor to use your logic on that.

5          If this law said no African Americans are allowed in

6   the first lottery, there are going to be two.  Nobody would

7   say there is no irreparable harm there because you can apply

8   in a second lottery.  We all know that if you are --

9          THE COURT:  And doesn't the law at issue here, or at

10  least some portion of it may be COMAR, it may be the law -- it

11  doesn't say this is the criteria we are going to use moving

12  forward?

13         MR. JENSEN:  Well, Your Honor, you raise a good

14  point.  The issue there is there is law that says a statute or

15  regulation is not right for challenge until it is final.  So

16  the reason I didn't bring up whether the Plaintiff is going to

17  be allowed into that second lottery or not is it is not final.

18         I do point out that they have -- and I say this in

19  the brief.  I mean, I think if their argument is going to

20  hinge on a second lottery, it should be their burden to show

21  they are going to qualify for it.

22         THE COURT:  Plus, she could just say we are going to

23  have lotteries forever.

24         MR. JENSEN:  Correct, Your Honor.

25         THE COURT:  And just keep sort of punting down the

1    road.

2            So with respect to <u>Northeast Patients Group</u>, it is

3    kind of the obvious question, but that is medical marijuana,

4    and this is not.  And I will give you this much, as you read

5    that case, they do talk about this, I always mispronounce it,

6    the Rohrabacher-Farr Amendment, which actually had more

7    experience within a criminal context arguing various things

8    about marijuana.

9            But they do acknowledge that that is a significant

10   piece in the analysis.  Essentially, that the federal

11   government has explicitly said they are not going to -- I

12   mean, this is paraphrasing of course, but they are not going

13   to prosecute anyone for being involved in the medical

14   marijuana trade.  So that opinion seems to be focused on

15   medical marijuana.  This obviously is not.  Why would that

16   case govern the recreational rule?

17           MR. JENSEN:  There were two cases out of Maine, Your

18   Honor.  One had to do with adult use, and one had to do with

19   medical.  The difference being that in the adult use -- I

20   mean, it is the same alternate analysis under the Dormant

21   Commerce Clause, but the reason they were two different, they

22   were two different systems.

23           Under the adult use, you got extra points in a

24   graded system if you were residents.

25           THE COURT:  That is the <u>NPG</u> case or is --

```
 1              MR. JENSEN:  I believe so, Your Honor.

 2              THE COURT:  Okay.

 3              MR. JENSEN:  I mean, the names get a little bit

 4  muddy.

 5              THE COURT:  And these are mostly your cases.  Were

 6  you on those cases?

 7              MR. JENSEN:  I was not on those cases.

 8              THE COURT:  The reason I am peppering you is because

 9  you know more about this than anyone it seems, and that is

10  great.  That is why you are here.  But that case, the NPG

11  case, was that decided on appeal?  Was that consolidated with

12  the --

13              MR. JENSEN:  So the --

14              THE COURT:  Oh, go ahead.

15              MR. JENSEN:  The NPG case was purely adult use.

16  Then that actually came to my memory before the medical case.

17  On the adult use, the state attorney general decided that was

18  not an offensible statute, so they abandoned it.  And they

19  voluntarily abandoned the law.  And I have cited that I

20  believe in the motion, and if not, in the rebuttal.

21              THE COURT:  Yes.  And I agree there are numerous

22  instances, including Northeast Patients Group, but the state

23  basically said, yes.  If we apply the Dormant Commerce Clause,

24  we lose.  And quite frankly, I am not going to opine on the

25  entire nature of these state marijuana schemes, but you are
```

1   focusing on the sale of licenses.  There are other aspects,

2   the growing.  Other areas where if you did apply the Dormant

3   Commerce Clause, there may be problems.  In effect, these all

4   seem to be little, isolated intrastate markets that if

5   Congress flipped a switch and legalized marijuana, you would

6   be a very busy person, I would think.

7           And I will also give you that I am not in any way

8   thinking Congress is going to opine on that.  I mean, it is

9   not my job to decide what they are going to do or to think

10  about it, but it seems to me that that discussion, that

11  legalization at the federal level is imminent has been going

12  on forever.  And if anything, the only discussion is about

13  reclassifying marijuana as a different, you know, tiered drug.

14          So putting that aside, I think the major issue I

15  have is just that question is legality as it pertains to the

16  adult recreational market.  And Northeast Patients Group

17  dissent, Judge Gelpi, I think it is, seems to be in those

18  courts that have held that the illegality makes it sort of

19  exempt from the Dormant Commerce Clause, and that is what they

20  are clinging to.  And that seems to be pretty persuasive.  So

21  I guess my question is, after all that, you know, why would

22  Northeast Patients Group apply?

23          MR. JENSEN:  Sure, Your Honor.  I would like to

24  mention two things in response to that.  One is I will circle

25  back to what I said earlier that I believe this is going to be

1    appealed whichever way you rule --

2              THE COURT:  Sure.

3              MR. JENSEN:  -- it and expedited.  So I would ask

4    the Court to consider that even if the Court views it as an

5    open question, to balance the harms and consider putting the

6    injunction in place until it is resolved.

7              I would also point out that it is true that they

8    relied on in the medical case out of Maine out of the First

9    Circuit, that they relied on the Rohrabacher-Farr and also the

10   Cole memo one.

11             I would point out, this is in the briefing I

12   believe, when Congress interviewed the current attorney

13   general before confirming him, they raised this directly with

14   him.  How are you going to deal with the fact that cannabis is

15   federally illegal, but it is has been legalized in many

16   states.  Paraphrasing his answer was, you know, I think we

17   have better things to do than worry about state-legal

18   marijuana, and I don't intend to enforce.

19             So Congress confirmed him after that answer.  So I

20   think that evidence is an intent by Congress to leave the

21   state programs alone notwithstanding the federal legality just

22   like they did with the medical programs.

23             THE COURT:  So there is no -- you know, throughout

24   the last 20 years, there have been formalized attorney general

25   memos on marijuana prosecutions, typically with respect to

1    medical marijuana, and you are not pointing to any specific

2    correspondence or policy position by the Department of Justice

3    on that?

4              MR. JENSEN:  Your Honor, the Cole memo was put out

5    for medical and that was repealed, I believe, maybe in 2019.

6    I can't say I remember exactly when.  But the Cole memo is not

7    in place for medical either.  So there is no memo for adult

8    use and there is no memo for medical, and yet, the Court is

9    relying on the intent of the Attorney General to not prosecute

10   in their opinions.

11             THE COURT:  But what if there was -- I was trying to

12   come up with an example, and maybe Judge Gelpi was hitting on

13   this a little bit.  What if the State of Maryland passed a law

14   that said out of state fentanyl dealers get double punishment?

15   It is normally a 10-year max, it goes up to 20.  If it is

16   normally a 20-year, it goes up to 40 if you are from out of

17   state.  Under your rationale, couldn't the fentanyl dealer

18   challenge that on Dormant Commerce Clause grounds?

19             MR. JENSEN:  Your Honor, that may be -- I have to

20   think this through.  That may get into extraterritoriality.

21   Unless you are talking about solely a crime committed within

22   the jurisdiction based on somebody traveling.  You know, I

23   have no criminal law background.  So I am hesitant to opine on

24   that, but it is possible.

25             THE COURT:  Yes.  It just seems to -- obviously,

1   that example -- and I am not trying to equate the two.

2           MR. JENSEN:  Right.

3           THE COURT:  Obviously, marijuana is being treated

4   different than the "harder drugs".  But it is an issue that it

5   remains illegal.  And certainly, there are still prosecutions

6   at the federal level for growing it, selling it.  They may be

7   rare, but they are still happening, at least within the last

8   five years.  And I can attest to that personally having

9   defended a few myself.

10          MR. JENSEN:  Your Honor, when you say that there

11  have been prosecutions are you talking about state-legal

12  licensed?

13          THE COURT:  I am talking about criminal prosecutions

14  for marijuana at the federal level for its production, for its

15  importation.  It is still criminalized.  And so I completely

16  agree with you that it is different than the other drugs, and

17  maybe you didn't even say that, but I think it is implied.

18  But this issue of illegality is one that is hard to get

19  around.

20          MR. JENSEN:  Your Honor, I don't profess to know

21  every prosecution --

22          THE COURT:  Sure.

23          MR. JENSEN:  -- in the country or, you know, I focus

24  mostly, of course, on California.  But I am not aware of any

25  prosecution within the last several years of a state-licensed

1    person complying.  And I think there is a distinction.  You

2    are correct that marijuana is marijuana, but when the Attorney

3    General was asked how he would deal with the fact that

4    marijuana is federally illegal but state legal, his response,

5    and again, I am paraphrasing, but it is in there, was

6    something to the effect of we have better things to do with

7    our time than worry about state-legal marijuana.

8              So I think his statement does not apply if somebody

9    is doing something illegal, whether that is crossing state

10   lines or growing without a license.  And I think we see that

11   in all sorts of things.  You know, you can --

12             THE COURT:  Yes.

13             MR. JENSEN:  Alcohol is -- legally, you can

14   transport it across state lines.  You can sell.  You can do a

15   lot of things, but you can't do that without a license, and

16   you can't do it to people under 21.  And you would be

17   prosecuted for that even though the product is legal and

18   licensed and subject to the Dormant Commerce laws.

19             THE COURT:  Fair enough.  So with respect to the

20   actual -- now, let's get past the legality part and say we are

21   doing the actual analysis.  It seems well-accepted, and

22   everybody seems to be arguing this sort of two-tiered

23   analysis.  And you are saying that, and I am just focusing on

24   that one --

25             MR. JENSEN:  The third part.

1          THE COURT:  The third part.  I keep calling it a

2    prong and I guess that is fair, but it does not on its face,

3    like some of the other challenged statutes, require Maryland

4    residency at the time of the application or a significant

5    Maryland presence or some of the key words that have caused

6    problems in the past.  I don't profess to know anything about

7    writing the law, but I suspect State of Maryland took its time

8    and probably reviewed some of those decisions.

9          But regardless, you are saying in providing in-state

10   and out-of-state percentages for these six schools that

11   qualify.  I was going to list them, but we all know what they

12   are.  So I understand that in 2024 or 2023, those schools had

13   a large percentage of Maryland residents enrolling.  But I

14   feel like I have to do a lot of guessing and extrapolating.

15   And it may ultimately prove true to get to the point where

16   under tier one, we find that this is a -- I find that it is a

17   substantial impact in favor of Maryland residents.

18          I am trying to figure out why just one year of data

19   is enough to conclude that this law fails under tier one.  I

20   guess that is the short question.

21          MR. JENSEN:  Your Honor, I don't think you have to

22   find a significant impact.  I think you have to find that it

23   burdens out-of-state more than in-state.  The Variscite case

24   in Los Angeles that was not directly appealed, one of the

25   things that the court found in there, the City listed

1  disproportionately impacted areas within Los Angeles.  And

2  they said, and these are the criteria if you can find them

3  from another city or another state.

4        And I haven't looked at that opinion in quite a

5  while.  My recollection of it is the court said that although

6  it was at a preliminary junction standard, not the summary

7  judgment, she found it was a likelihood of success violated

8  the Dormant Commerce Clause because the City had provided the

9  zip codes and said this is how you find out if you are in a

10 ----.

11        THE COURT:  And then out-of-staters had to jump

12 through a bunch of hoops, if I recall correctly.

13        MR. JENSEN:  Yes.  So, Your Honor --

14        THE COURT:  That isn't the case here though.  This

15 is --

16        MR. JENSEN:  No.  But that is not the point I am

17 citing.  I am citing it for the fact that you don't have to

18 have a complete definitive bar that nobody from outside of the

19 jurisdictional state can enter.  Even if it is possible for

20 other people to get in, if you put in a higher hurdle, it

21 burdens out-of-state commerce.  Then that is --

22        THE COURT:  So I agree with you on that, but that is

23 what my point is.  How does the data that you have given me

24 show that higher burden?

25        MR. JENSEN:  I don't think I need to provide that

1    data, Your Honor.  I provided it as back up, but I think it is

2    sufficient to say that the statute says has to be a college --

3    well, I guess they say institute of higher education, but we

4    all know what it means, in the state.

5            And the Dormant Commerce Clause law says that it is

6    a almost, I forgot the exact words, but it is an almost

7    automatic disqualification if it is --

8            THE COURT:  If it per se.  But wouldn't that mean it

9    would say residents of Maryland?  It doesn't speak to

10   residency at all.  And this is a whole other issue that I am

11   certainly struggling with, whether the requirement to attend a

12   Maryland school equals a requirement to be a Maryland resident

13   because obviously, there are out-of-state residents who are

14   attending Maryland schools.  And whether that even is required

15   under the analysis, I don't know.  I have to dig a little

16   deeper on that.

17           But as I read this law, it does not, on its face,

18   appear to me to require Maryland residency.  And if anything,

19   it is so backward looking, that as we look at the real issue,

20   which is are you putting a thumb on the scale in favor of

21   Maryland commerce in the present time, it doesn't appear to do

22   that.

23           MR. JENSEN:  Your Honor, I disagree with that.  I

24   think there are far more people who live in Maryland who are

25   likely to attend a college in their --

1           THE COURT:  But that is what I am talking about.

2    That is an assumption.  And it may be a good one, but I don't

3    have that in front of me.  So if I am supposed to enjoin a

4    law, don't I have to make that assumption?

5           MR. JENSEN:  I don't think it is a stretch to think

6    that if you list off six schools that are in a state, that it

7    is more likely the people in the state went to those schools

8    than out of state.  I don't know anybody who went to any of

9    those schools.

10          THE COURT:  Well, you are from California, and I

11   will agree they are more regional.  But Morgan State by the

12   date that you submitted, in 2024, I think more than half of

13   the students enrolled there are from out-of-state.  And then

14   we go back to the founding because as far as I can read this

15   law, and there is a little bit of debate to me as to whether

16   the Pell Grant thing means now 40 percent.  Because obviously,

17   Pell Grants didn't come into existence until I think the early

18   70s, but these universities were in existence far beyond that.

19          So assuming it means 40 percent or more today, it

20   certainly doesn't mean that you had to attend the school

21   during a period where Pell Grants were given.  So quite

22   frankly, we go back to the founding of all these six

23   institutions, and I have got to believe there are a

24   significant number of graduates who are living out-of-state.

25   You want me to say there is a significant number of graduates

1   living in-state, which isn't crazy, but I just don't have that

2   in front of me.

3          MR. JENSEN:  Your Honor, this is probably not really

4   the point on how to do it for the Pell Grant, but I would

5   think if you go back before Pell Grants were allowed, that it

6   is not true that 40 percent of the students were eligible for

7   Pell Grants.  So I would think at the very minimum, the time

8   limit starts when Pell Grants were created.

9          But I understand your point, but does that mean you

10  go today, or can you go back 10 years, or can you go back all

11  the way to the 70s?  I understand that point.

12         THE COURT:  Yes.  I think the State had said, you

13  know, someone who has been in Nebraska for 30 years but

14  attended Coppin State for two years is eligible.

15         MR. JENSEN:  I don't know where those schools are,

16  how close they are to the border, but my guess is that the

17  vast majority, if not all of the students, probably lived in

18  Maryland at the time they attended those schools.

19         THE COURT:  Well, they would have -- well, COVID, by

20  the way, with remote attendance, I have no idea how that

21  impacts the analysis, but let's take that out.

22         I am not going to say you are nuts for thinking that

23  a large number of Coppin State students are from Maryland, and

24  a large number of Coppin State graduates were from Maryland at

25  the time they attended or have remained in Maryland.  Buoy

1  State, on the other hand, a little bit closer to Washington,

2  D.C., accessible by rail.  Morgan State, your own data shows a

3  significant number of students from out-of-state.  UMES, I

4  don't know as much about their geographic makeup.  But point

5  is, this doesn't strike me as the same thing as saying you

6  need a significant New York presence, or you need a driver's

7  license from Maine, or you need a bank account in Maine.

8           MR. JENSEN:  Your Honor, the significant New York

9  presence, as I think you elude to it, again, can be a bank

10 account.  You can live in California and open up a bank

11 account in New York and satisfy that.  I think that is a much

12 lower burden than enrolling in a college in Maryland.  Even if

13 it is in -- you mention one is near D.C. and accessible by

14 rail.

15          But, you know, again, I would point out, I think

16 there were six colleges, and one of them had an in-state

17 population I believe roughly 42 percent.

18          THE COURT:  Yes.

19          MR. JENSEN:  But others had -- I think one went up

20 to 91 percent.

21          THE COURT:  Of course, that is now.  And none of

22 these people would be eligible now because they need two

23 years, at least, under that section.  But I mean, it is what

24 you have got.  It is what you can bring.

25          MR. JENSEN:  Right.  It is very difficult to find

1    the Pell Grant information.

2                    THE COURT:  Yes.

3                    MR. JENSEN:  Even when you contact the schools, the

4    schools themselves don't always have that.

5                    THE COURT:  Yes.  It is interesting because that

6    issue of where people are living now who attended, I suppose

7    the State could have provided the data on how many people

8    actually applied under that, the challenged prong.  That would

9    be helpful information, but it doesn't appear that we have it.

10                   Let me ask you one last thing and then I will let

11   you sit.  I really appreciate your answers and your time.  The

12   delay.  This question of Laches that the State raises.  I have

13   read the declaration, and it appears taking it as true, which

14   I will of course, that Plaintiff did not learn about this

15   until September.  Why not file the suit the next day?

16                   MR. JENSEN: Your Honor, just to close out our last

17   line of discussion.  I just, again, and I think Your Honor

18   gets it, but it does not have to be a complete bar.  It just

19   has to burden out-of-state more than in-state.

20                   THE COURT:  No.  I totally agree with you on that.

21   And going back, I completely agree.  I am struggling with the

22   number of assumptions I have to make to even find that burden.

23                   And the other thing I am struggling with is if we

24   move to tier two, let's say I don't find that burden at tier

25   one and we end up at tier two, and we start doing the

1  balancing test.  One of the other things I was really more

2  interested in asking the State, but I will ask you too, how do

3  you even do the tier two balancing without seeing the law in

4  effect?  I have never seen a case where they have preemptively

5  done tier two analysis.

6           MR. JENSEN:  Your Honor, the State's stated benefit

7  of this program is to provide benefits to people who -- I am

8  paraphrasing, and it is written there, but it is to the effect

9  of to provide opportunities to students who qualify for

10  government benefits.  None of that is limited to Maryland.

11  They could excise a couple words from this and just say you

12  have to go to college where 40 percent receive Pell Grants,

13  and they could get that same benefit.

14           THE COURT:  Which you raise a great point, and I

15  will get to that.  Finish your thought and then I will come

16  back.

17           MR. JENSEN:  No.  But they didn't do that.  That

18  included in the State, which the only reason for that would be

19  economic protection is then to benefit the State's voters.

20           THE COURT:  Well, as you mention in the State part,

21  I can't rewrite the law, as the State pointed out.  And you

22  have taken me away from Laches, which might be a good move.

23  Maybe not intentional, but well-done.  We will come back.

24           I can't rewrite the law.  So if all I can do here is

25  strike out the entire prong three, and your client still can't

1  a license.

2          MR. JENSEN:  No.  I don't think that you can strike

3  the entire prong three, Your Honor.  I think you have to

4  strike all of it.  I don't think there is -- even if there is

5  a saving clause, I having never seen a saving's clause that

6  applies to a subsection.  So I think the Court's only option

7  would be to enjoin the unconstitutional law.  The Legislation

8  can then rewrite it and put out a constitutional one.

9          THE COURT:  But then that kind of gets into your

10 standing because some of the cases that I have seen where they

11 had no prong withstanding, even in situations where the

12 Plaintiff may not have otherwise qualified, was that sort of

13 conjunctive requirement.  You need to be here and here and

14 here, and as a result, someone who couldn't get a license was

15 able to have the entire law wiped out or at least make that

16 effort.

17         Here, the State has carefully laid out three

18 different areas.  So I am supposed to proceed as narrowly as

19 possible and proceed in a manner that does not overturn the

20 will of the voters.  That would seem to just be to strike

21 prong three.

22         MR. JENSEN:  Your Honor, I don't know the First

23 Circuit law on this point, but my understanding is that would

24 be essentially a line item, you know, to go in and strike a

25 portion.  It is essentially the same as striking out in the

1    state, right?

2              THE COURT:  But you don't even have standing to

3    challenge the first two.  So I couldn't -- I don't think that

4    you are trying to have --

5              MR. JENSEN:  I don't --

6              THE COURT:  -- you are even professing standing on

7    the first two points.

8              MR. JENSEN:  I am professing standing on a joined in

9    the licensing.  If there is a way to get into the licensing

10   program, my client has not heard of that, then I have standing

11   to challenge the entire program.

12             It was never in the papers to ask the Court to

13   strike just part three and let the lottery go forward with the

14   first two options.  I am not aware of any jurisdiction where

15   that was done.  I mean, the way they were enjoined in law, the

16   entire program was enjoined in Detroit.

17             THE COURT:  Again, I thought that was a sort of

18   conjunctive law that required all three.  It is going to be

19   hard to show up in a transcript my noises, but point being,

20   you have got to do A, you have got to do B, you have got to do

21   C.  This is different, and maybe for a good reason, but I see

22   your point on that.

23             Last, let's go back to Laches.

24             MR. JENSEN:  Sure.

25             THE COURT:  And this may have opened the door even

1    wider than that if the challenge is to the entire law.  Your

2    client finds out in September that the law is here.  File a

3    lawsuit then.  I mean, your whole standing requirement sort of

4    hinges upon the fact that you are ineligible from the start.

5         If I agree with you that making you go through the

6    motions of seeking the certification and then applying because

7    obviously -- I am saying obviously.  It appears from the

8    record that your client did not apply, which I am with you on

9    that.  I think that would be futile, and your client appears

10   to have satisfied the requirements that they be sort of ready

11   and able.  They seem to have satisfied those requirements back

12   in September.

13        MR. JENSEN:  Your Honor, I disagree with the Court

14   when you said that we didn't apply, we don't have to because

15   it would be futile.  This is a two-part application system.

16   First, you have applied what they call SEE delegations --

17        THE COURT:  Right.

18        MR. JENSEN:  -- social equity.  And then, and only

19   then, if you pass it will they give you the link.  I believe

20   it was on a computer, some kind of code to apply.  So we were

21   never permitted to put in a registration for the lottery.

22        THE COURT:  Right.  I understand that.  But my point

23   is to say that you knew that the first certification part was

24   going to result in a rejection back in September.

25        MR. JENSEN:  Your Honor, the State has argued in its

1  briefs that we don't have standing because we didn't put in an

2  application.  If we have moved before --

3          THE COURT:  I am not talking about standing.  I am a

4  hundred percent understanding of your point there, and

5  actually am sort of agreeing with you.  My question is Laches.

6          MR. JENSEN:  Right.  My answer though goes to Laches

7  because if we had applied in September, the State would have

8  said we have no standing because we didn't apply, we were not

9  rejected, and so on.  They made that argument now, and we did

10  apply, and we were rejected.

11         THE COURT:  So you apply for the certification, and

12  when do you get the rejection for the certification?

13         MR. JENSEN:  On December 13, I got a letter from

14  Defendants that we were rejected.  Two weeks later, I began

15  settlement negotiations.  Those ended on January -- I am

16  sorry.  Those ended on January -- I have 26th, but that can't

17  be right because I think we filed the complaint on 26th.  But

18  it was somewhere from December 27 until somewhere in probably

19  mid-January.  And then I think it was 10 days after, they --

20         THE COURT:  But the settlement negotiation's part,

21  do you have a case that says that that tact can substitute for

22  the actual filing of a lawsuit?  That is a choice you made to

23  contact the State, assume to potentially see if they will see

24  around their licensing scheme or something like that.  I mean,

25  that is the only settlement I could think of that would be

1  beneficial to your client.

2         MR. JENSEN:  Well, Your Honor, my typical practice

3  is in civil litigation, but I have never had a court punish a

4  litigant for attempting settlement prior to bringing a

5  lawsuit.

6         THE COURT:  That wouldn't be punishment so much as

7  saying that there is no reason settlement can't go on at the

8  same time that a complaint is filed.  Because at least at that

9  point, the State is on notice that this is going to get

10 reviewed, and they can stop spending some of the resources

11 that they are spending.  You know, it is not punishment.  It

12 is just the truth that as the State continues to plow forward

13 with this and you have not filed suit or sought the

14 injunction, the balances seem to be tipping more towards them

15 than towards you.

16        MR. JENSEN:  Well, Your Honor, even if that is true,

17 we were rejected on December 13th, and we filed the case on

18 January 26th, which I think is short considering the

19 complexity of the issues going on.

20        THE COURT:  Yes.  I guess I just can't get over the

21 fact that I think that this case could have been filed in

22 September.

23        MR. JENSEN:  Perhaps, Your Honor, but I also point

24 out that they had not finished registration for the lottery at

25 the time we filed it, and they certainly haven't held the

1   lottery.

2           THE COURT:  Well, that is true, as far as I know.

3   All right.  Thanks.  I may have some --

4           MR. JENSEN:  And --

5           THE COURT:  Go ahead.

6           MR. JENSEN:  I also point out, in their harms, I

7   mean their harm is $650,000, which for a State to be able to

8   buy a constitution violation for $650,000, seems very cheap.

9   And as far as that 650,000 they spent is to review

10  applications, they can reuse two of the three sections.  You

11  know, if they put it back out and they strike the third

12  category, they can use it and go forward right now.

13          If they revise the law to strike the part that says

14  --

15          THE COURT:  I thought you said they can't go forward

16  with it?

17          MR. JENSEN:  No.  I said if you enjoin it and they

18  revise the law to get rid of the third section, then they can

19  go forward with the lottery.

20          THE COURT:  Then how is that different than me just

21  saying, okay.  The third section is out.  Go ahead on one and

22  two.

23          MR. JENSEN:  Because one is a legislative act, and

24  one is a judicial act.

25          THE COURT:  I know.  We are in court.  I think you

1   are asking for a judicial act.

2           MR. JENSEN:  I am not asking the Court to rewrite

3   and strike the third prong.  What I am saying is if you adjoin

4   it, it goes back to the legislature.  They can pass a

5   constitutional statute.  There is no reason they can't do

6   that.

7           THE COURT:  All right.  So you are saying I enjoin

8   the whole thing, one, two, and three.  It goes back to the

9   Maryland State Legislature, they come back with just one and

10  two.  They use the old applicant pool.  Of course, that

11  assumes that there are applicants that didn't, like your

12  client, attempt to or qualify under number three.  But okay.

13          MR. JENSEN:  Your Honor, that is not an odd result.

14  I mean, that is what happened in Missouri.  That is what

15  happened in Illinois.  And that just is in the context of

16  cannabis.  I am sure there are plenty of examples where a

17  state put out an unconstitutional law, was challenged, they

18  revised the law to fit the purpose the state wanted, but

19  constitution it.

20          THE COURT:  No.  It is a fair argument.  I

21  appreciate it.

22          All right.  State, you are up.  I will give you the

23  same sort of time to talk about what you want to talk about,

24  and then maybe I will cut you off if that is okay.

25          MS. NELSON:  Thank you, Your Honor.  There are a

1   number of points Counsel has raised that I appreciate and look

2   forward to the opportunity to respond to.  But here, Maryland

3   has created a statute scheme that is materially different from

4   those that have been challenged in other states.  Your Honor

5   identified these three criteria by which an individual can

6   qualify as a social equity applicant, or in the alternative,

7   there are three options by which one can qualify.

8          None is mandatory.  None is a mandatory bar to

9   entering the application process.  And so while we have seen

10  similar cases in other jurisdictions, the statutes here are

11  materially different and the facts here are materially

12  different.

13         I would respectfully note, I understand where Your

14  Honor may be on redressability and you mentioned injury, but I

15  have to respectfully note, they have not established Plaintiff

16  was ready and able to apply for this application.  We have in

17  the record evidence that the application -- a complete

18  application submission required one to demonstrate, among

19  other things, a complete application, diversity plan,

20  operational plan, business plan, all documents that were

21  published to the websites and available for anyone to access

22  and work on.

23         And an applicant was required to submit a

24  certificate of good standing from the State Department of

25  Assessments and Taxations indicating that the business entity

1   was ready and able to conduct business in the state.  Here, we

2   have Plaintiff suing in her individual capacity.  That is a

3   material difference from the other cases that we have seen

4   Counsel participate in across the state.  So we have no

5   evidence -- and obtaining a certificate of good standing for a

6   new business entity is not something that happens

7   instantaneously.  There is a process and time ----.

8            THE COURT:  But isn't she just asking for the right

9   to apply, and by engaging in the process of seeking that

10  status, show that she wanted to apply?  And so she is not

11  asking for the license.  She is asking for the right to apply.

12  Isn't there a difference there?

13           MS. NELSON:  I understand that she is asking for the

14  right to become a verified social equity applicant by

15  demonstrating attendance at an out-of-state university.  That

16  was a necessary element of a complete application.  But no

17  other element of a complete application has been demonstrated

18  or pled here.

19           THE COURT:  But how would they do that though?  That

20  is the part I don't -- they would have to -- because if that

21  is something you submit with your application, they don't have

22  the code to even -- I am not acting like I know how it works,

23  but he was saying there is a code you get.  They can't even

24  put that in.  I assume it is online, and you get an error

25  message, and that is the end of it.

1           MS. NELSON:  So the application portal required one

2    to create an account through Maryland One Stop.  Applicants,

3    especially towards the end of the application or the end of

4    the application period, were encouraged to create the portal,

5    do as much of the application as you possibly can if you are

6    still waiting your final verification of social equity

7    applicant status.

8           The portal was not only accessible after you

9    received your social equity applicant verification code.  You

10   could create a One Stop account beforehand.  And even if you

11   couldn't, the application templates were published to the

12   Cannabis Administration website and the website for the

13   Cannabis Administration's Office of Social Equity.  So those

14   were publicly available to anyone to download, to look at, to

15   study, to work on, to demonstrate that they had ready to go,

16   that they would be ready and able to apply.

17          So Plaintiff's pleads that this is the only

18   requirement to the application that is not met, but that is

19   not --

20          THE COURT:  I mean, I am sympathetic though because

21   obviously -- let me put it in my own terms.  I am applying to

22   college.  I am getting into Harvard.  Just personal.  Okay.  I

23   know I am not.  So I need to go up there, find an apartment,

24   buy all the clothes, be all ready just to express my interest,

25   and then I know I am not getting in.  Maybe it is not a good

jj

1  example because it is too subjective, but point being let's

2  say that had a residency requirement, that was the only

3  reason.  Why make me go through all that?

4           MS. NELSON:  Your Honor, I --

5           THE COURT:  I didn't apply to Harvard.  Maybe it

6  would have happened, but let's just say probably not.

7           MS. NELSON:  Whereas, here, Plaintiff has pled this

8  is the only thing keeping them out of the lottery.

9           THE COURT:  Okay.

10          MS. NELSON:  They haven't established that.

11          THE COURT:  Okay.  I see your point.

12          MS. NELSON:  There is a bald assertion in the

13  complaint and in the motion that this is the only thing

14  keeping them out of the lottery.  And, in fact, there were

15  communications with the state's vendors, CSI, in which during

16  the verification process, Plaintiff's Counsel asked CSI to

17  confirm is this the only thing keeping us out of the

18  application process.  And CSI responded that they did not have

19  sufficient information to verify ----.

20          THE COURT:  But it is definitely a thing.

21          MS. NELSON:  It is a thing --

22          THE COURT:  Okay.

23          MS. NELSON:  -- for sure.  It is inconsistent with

24  the pleading.

25          THE COURT:  Okay.

1          MS. NELSON:  It is not supported by any evidence

2    that we understand would be available and has been available

3    in other cases Counsel has participated.

4          THE COURT:  Okay.

5          MS. NELSON:  For example --

6          THE COURT:  But does anybody else have this type of

7    system where you have to go to an outside vendor for approval

8    first?

9          MS. NELSON:  That I don't know, Your Honor.  When my

10   client was designing the process, they did attempt to make the

11   social equity applicant verification process something that

12   they could assist people with before the application period

13   opened.  They weren't sure how many applicants, how many

14   individuals would be interested in pursuing that verification.

15   And that was a free service available to anyone interested in

16   applying.  So that is the thought behind that structure.  And

17   then the application period opened shortly after that social

18   equity applicant verification portal closed.

19         THE COURT:  So with this two tiered analysis, they

20   are saying this is facial discriminatory because of this

21   explicit reference to the need for the state university

22   attendance.  You say no obviously, and you cite to some of the

23   stuff that I was asking before.  Specifically, that it --

24   well, why don't I let you say why it is not instead of me

25   telling you why you told me earlier.  Respond to that, and

1    then we can maybe continue that conversation.

2            MS. NELSON:  Thank you.  This is a materially

3    different provision from that which has been an issue in other

4    states.  Here, there is no residency requirement.  There is no

5    requirement that only Maryland residents can apply to these

6    schools.  There is no requirement that alums of these schools

7    are required to live in the State of Maryland.  And this

8    criteria did not exclude participation from out-of-state

9    individuals.

10           Plaintiff offers a very limited snapshot of

11   evidence.  There is additional data available demonstrating

12   out-of-state student enrollment.  We don't have data available

13   on out-of-state alumni participation, but we know that this

14   criteria did not bar out-of-state individuals from qualifying

15   under this criteria.  Again, which was an offered alternative

16   to the other two criteria that were available to individuals

17   from across the country to seek verification with data from

18   their respective states.

19           THE COURT:  So you obviously, or your client, has

20   the data on how many people applied checking the prong that is

21   at issue here; how many people are using the two-year Pell

22   Grant school.

23           MS. NELSON:  I do have some data on that, Your

24   Honor.  Here, the Cannabis Commission received approximately

25   1,700 applications total.  Those applications represented

 1  approximately 1,900 verified social equity applicants.  Some

 2  social equity applicants participated at a lower ownership

 3  threshold and joined together for an application.

 4        Of those verified social equity applicants,

 5  approximately 12 percent were verified under the Pell Grant

 6  criteria alone.  And so the other two criteria were far more

 7  significant in enabling access to the application process and

 8  the licensing lottery.

 9        THE COURT:  Interesting.  Okay.  So when we talk

10  about the -- if we get to tier two, I had asked the question

11  before, and I really intended to ask you.  With respect to

12  tier two analysis, how do you do that without seeing who

13  actually gets the licenses?  A lot of this is guessing and I

14  get that, and obviously, when you are not applying during a

15  commerce clause analysis, you are looking forward to the

16  effects.

17        But we have already, at that point, jumped past, and

18  I, at that point, would have found it is not facially or in

19  practical effect discriminatory.  Do we even talk about tier

20  two?

21        MS. NELSON:  It is a challenge to attempt to apply

22  the existing case law to the cannabis industry specifically

23  because there will be no interstate sales of goods.  There

24  have been state criminal prosecutions against cannabis

25  operators who have attempted to ship cannabis goods across

1   state lines in between two different regulated markets.

2              And we don't have data on the level of interest in

3   pursuing a cannabis business opportunity in Maryland from

4   individuals in other states.  There is simply -- it is one

5   more point upon which Plaintiff asks this Court to make an

6   assumption about the level of interest in participating in

7   Maryland's cannabis industry.

8              It is reasonable to conclude that the majority of

9   interest in pursuing a cannabis business opportunity would

10  come from locals who are interested in establishing and

11  operating a business where they are, so that they can tend to

12  that business.  And that is not to exclude out-of-state

13  individuals in any way, but where, especially as here, the

14  General Assembly had an interest in encouraging social equity

15  applicants into the industry and creating opportunities for

16  small business owners who otherwise did not have significant

17  cannabis industry experience, it is reasonable to conclude

18  that the majority of interest would come from local

19  individuals.

20             THE COURT:  So you probably just answered this, but

21  let's say that we are at tier one, and I say this does appear

22  to have the practical effect of discriminating against out-of-

23  staters.  Do you have a compelling interest that you think

24  would make that still constitutionally permissible?

25             MS. NELSON:  We feel strongly that this does not

1    discriminate on its face.

2              THE COURT:  Of course.

3              MS. NELSON:  And the State --

4              THE COURT:  But a lot of states have come in and

5    said, hey, we totally acknowledge this violates.  And I see

6    why you are not because this is obviously -- I don't mean to

7    demean the other states, but this is far more thoughtful, some

8    may say calculated, but whatever.  It is different.  But let's

9    just get past that and say I do find that it is in practical

10   effect or on its face.  What is the compelling interest that

11   makes it survive?

12             MS. NELSON:  The State does have an interest in

13   supporting the health of its universities who provide economic

14   and educational opportunities to those who come from limited

15   means.  So we have seen that in other lines of litigation in

16   the state where we have state universities that make it part

17   of their mission to provide educational opportunities to those

18   who come from more challenging circumstances.

19             And here, the State has adopted a criteria that

20   recognizes those universities, those who have attended those

21   universities and seeks to create additional economic

22   opportunities for those who are serving individuals who

23   qualify for government benefits.

24             THE COURT:  Of course, the response would be totally

25   agree with you, but the state part is completely unnecessary

 1   to achieve that goal because there are other schools on the

 2   list submitted that are out of state that educate the same

 3   population or aim to do so, and you could meet that goal in a

 4   way that doesn't put a thumb on the scale in favor of Maryland

 5   schools.

 6           MS. NELSON:  I understand their argument, Your

 7   Honor, and I think where the State has looked to create

 8   additional opportunities for its public institutions that it

 9   funds and supports and looks to educate people from

10   everywhere.  That is a legitimate public interest, and there

11   is no requirement that they take the most narrowly tailored

12   approach here.

13           I think what we have seen is Counsel, I understood,

14   and this was my interpretation, nearly concedes that we are

15   not under the facially discriminatory element here.  That we

16   are under the Pike analysis.  That where --

17           THE COURT:  I don't think so.  I kind of read it the

18   opposite.  That they are saying because of the inclusion of

19   the State, that that is explicitly favoring state schools, but

20   in practical effect, even if we don't agree with that, in

21   practical effect, given the data that was presented, you are

22   roping in almost exclusively Maryland residents.  And in

23   essence, you are just getting to say, hey, we want graduates

24   to be -- we want Maryland residents who went to these six

25   schools.  That is what you are basically saying.

1          MS. NELSON:  We want to make additional

2    opportunities for those who attended those schools, and they

3    can be from anywhere.  They are from anywhere right now.

4          THE COURT:  But you would agree that practical

5    effect, that is a hundred percent Maryland residents.  That is

6    not the numbers we are dealing with, but let's say it is close

7    to that.  Wouldn't that be the impractical effect?  Putting a

8    thumb on the scale in favor of Marylanders.

9          MS. NELSON:  I understand Your Honor's point, but I

10   have to note that we don't have information available on the

11   level of interest from those who are out of state.  Here, we

12   have one Plaintiff suing in her individual capacity, and we

13   don't know how many others, if any, would have sought

14   verification under a different criteria.  We --

15         THE COURT:  It is interesting because I -- a lot of

16   the Dormant Commerce Clause, if not all of it, analysis deals

17   with present benefits.  Essentially saying, hey, you can --

18   only residents of this state can take advantage of this

19   program, or you have to live here now and have lived here the

20   last -- this is a little bit different because it is backward

21   looking in some sense.  It literally is because you have to be

22   there for two years.

23         And then even assuming that it is a proxy for

24   Maryland residency, just saying that that's true, and I am not

25   finding that, but let's just accept that it is, I have never

1  seen a law that says you can apply, you can get the license,

2  you can get the benefit if you lived in the state 25 years

3  ago.  And I am curious how that plays into the analysis.  Does

4  it matter?

5          Let's say there was a law, there was a fourth prong

6  that said, and also, if you lived in Maryland for one year

7  prior to 1988, you can get a license.  Would that violate the

8  Dormant Commerce law?

9          MS. NELSON:  It would be very difficult to identify

10  the present day effect in interstate commerce if you were

11  creating such an open criteria.

12          THE COURT:  Yes.  Okay.  May not have any rational

13  basis.  There may be another problem with it, but it is an

14  interesting thing that has kind of been jumping out at me.

15          The Supreme Court has said explicitly that there is

16  an interstate market for marijuana, and as a former federal

17  public defender, I have some evidence of that.  Certainly, not

18  my clients, but I watched other cases.  So how can you come in

19  here and say that it is illegal, so let's just ignore that?

20  Because that is kind of, I don't want to say bugging me, but

21  it seems like you are trying to have your cake and eat it too.

22          MS. NELSON:  Congress has steadfastly refused to

23  take legislative action on adult use cannabis in any form in

24  repeated sessions being asked to consider even the Safer

25  Banking Act, initially filed and introduced as the Safe

1   Banking Act, that would create limited protections for state-

2   licensed cannabis businesses to access more comprehensive

3   banking services from federally insured banks.  They have not

4   been able to progress any legislation that would create any,

5   you know, recognition that there is a federally recognized

6   interstate cannabis market.

7           We simply aren't there yet.  There are potential

8   actions coming.  There are bills pending that are filed year

9   after year and don't move.  So whereas here, the states have

10  been left to create their own programs ---- and regulate their

11  own programs independent of federal interaction and where

12  there are still very strict limits on safety and security

13  elements of regulating a cannabis industry and being able to

14  ensure that the industry's operating in a safe way, and that

15  no product can cross any state lines or cross the line onto

16  any federal property within the state.

17          THE COURT:  Is that no products sold?

18          MS. NELSON:  No regulated product is permitted to be

19  possessed on federal grounds.  So --

20          THE COURT:  That I get.  What about the state line

21  part?  Can't people come from other states and buy marijuana

22  in Maryland?

23          MS. NELSON:  That is not legally protected activity

24  if they try to take it home to their state.  And individuals

25  are warned of that.  That is not -- the Maryland Cannabis

1    Program offers no protection if you take this across state

2    lines.

3              THE COURT:  But it doesn't require you to show a

4    driver's license and show Maryland registry at purchase?

5              MS. NELSON:  That is right.

6              THE COURT:  Okay.  So sort of the brown paper bag

7    approach.

8              MS. NELSON:  Well, and people may be here for

9    vacation using it --

10             THE COURT:  Sure.

11             MS. NELSON:  -- within the state.  You know, it is

12   difficult to -- you know, there are no residency requirements

13   in the Maryland program at any point.

14             THE COURT:  So the State could say if you are out of

15   state, you pay a $20 tax per sale.  If you are from Maryland,

16   it is $2.  Well, let's do percentage.  It is a 20 percent out-

17   of-state, 2 percent in-state.

18             MS. NELSON:  And perhaps the State could, but they

19   wouldn't, and they haven't here created any hurdle that is any

20   higher for an out-of-state individual than a Maryland

21   resident.  So in creating these statutes, the General Assembly

22   did take care to avoid any residency requirements or any

23   restrictions that would exclude others or disproportionately

24   negatively impact anyone.

25             And that is also a carryover from the medical

1    program where there was a careful recognition that many do

2    travel to Maryland for medical procedures, and many do need to

3    be here from out of state when they are receiving treatment at

4    one of the local medical institutions.

5        THE COURT:  So earlier, I had made the comment that

6    if Congress does legalize marijuana, and I will hold my breath

7    on that, but if they did, isn't that going to invite like a

8    store of Dormant Commerce Clause problems?  And is Maryland

9    trying to get out in front of that a little bit with it

10   because the scheme seems to be a little bit more measured here

11   and perhaps with a nod toward the future.

12       I don't expect you to understand everything about

13   the TRAP data laws, but you are Attorney General's Office.  So

14   I figured I would ask.  Is that what is going on here; an

15   effort to brace for the future?

16       MS. NELSON:  I believe the General Assembly

17   attempted to approach this in the same way that they would any

18   other industry.  That they attempted to create

19   constitutionally sound criteria that would be legally

20   defensible under the Commerce Clause.

21       I don't know that anyone anticipates a federal

22   marketplace anytime soon.  And we aren't sure of the impact

23   of, you know -- or what changes may occur at the federal level

24   next.  But the General Assembly did design an approach here

25   that would be legally defensible for any industry.

1          THE COURT:  So with respect to the Laches, I will

2     kind of close on that unless there is anything else you want

3     to draw my attention to.  When, in your view, could the

4     Plaintiff have filed this lawsuit?  And I think you said never

5     basically.

6          MS. NELSON:  Plaintiff could have filed this lawsuit

7     on May 4th, 2023, when the law was passed.  The criteria is in

8     statute.  The Governor signed the law into effect on May 3rd.

9     If the challenge is to the statutory language, that could have

10    been filed on May 4th, before the State spent a single dollar

11    attempting to implement this ambitious statutory scheme.

12         It was very important to the General Assembly that

13    the regulator effectively and swiftly set up additional

14    regulated cannabis businesses.  Where, in other states, there

15    has been significant delay between legalization and access to

16    regulated retailers, that only strengthens the legacy market,

17    and they have seen additional public safety concerns develop

18    in those other states.  So that claim could have been brought

19    as soon as the law was passed.

20         I understand that Plaintiff has submitted an

21    affidavit indicating, first, that she is not sure when she

22    learned of the opportunity, but it may have been in September.

23    We know from public records that Plaintiff has been involved

24    in applying for cannabis business licenses since 2019.  And we

25    know certainly that Counsel has actively participated in

1   litigation very similar to this in many other states for the

2   past few years.

3            So if she learned in September, which is the best

4   information provided in the affidavit, they could have brought

5   a challenge then.  The State, at that point, had not spent

6   money to conduct all of their outreach and education, and

7   technical assistance programs.  They had not spent money on

8   the social equity applicant verification process.  They had

9   not spent money on the application portal.  They had not spent

10  money on the application review process.

11           And no other applicants had paid application fees to

12  the State.  So here, Plaintiff does not recall when she

13  learned of this program, but the affidavit supposes it may

14  have been in September.  Plaintiff submitted a request for

15  social equity applicant verification and received a notice on

16  November 10th that there was a preliminary adverse

17  determination, and unless she provided more information, the

18  vendor was not able to verify her social equity applicant

19  status.

20           There was no further attempt at communication by the

21  Plaintiff with the vendor.  And so Plaintiff knew on November

22  10th, at the very latest, that she was not going to be

23  qualified as a social equity applicant.  November 10th was

24  before the application portal opened and before any other

25  applicants for a cannabis business license paid their

1  application fees.

2          THE COURT:  Well, what about the argument that they

3  tried, you know, to handle this out of court and that that

4  shouldn't be counted against him.  Or her.  Counsel is him.

5  So --

6          MS. NELSON:  There are interesting public records

7  available on that approach in other cases as well.  And

8  whereas here, Plaintiff waits until the eve of the lottery,

9  after the State has invested significant resources in the

10 process and after the State has engaged over 1,700 applicants

11 in the process, and then Plaintiff seeks to enjoin the entire

12 scheme, not just the criteria that they contend they are

13 grieved by.

14         I don't know that they should be given any grace for

15 making a settlement demand that, you know --

16         THE COURT:  Well, you don't have to go into what it

17 was or anything like that, but -- all right.  Two more

18 questions, if I can, and then I will give the Plaintiff the

19 last word.  But there was a back and forth over the relief

20 sought or not necessarily the relief sought, but the relief

21 that might be granted, and it is now turning to striking the

22 entire process as opposed to the third prong.  And maybe it

23 was that all along.  I don't mean to imply that it just

24 changed.  What is your view on that?

25         MS. NELSON:  The relief they advocate is overly

1    broad.  It has absolutely nothing to do with their injury.

2    Plaintiff states, without any support, that she would not have

3    qualified under the first two eligibility criteria, and I

4    think, you know, we do have case law, precedent in the Fourth

5    Circuit that an injunction should be tailored to restrain no

6    more than what is reasonably required to accomplish its ends.

7    If the constitutional injury is in one of the three alternate

8    criteria, then that is the most that should be enjoined in

9    this case.

10            It is a overly broad request, and it is not clear

11    what is behind --

12            THE COURT:  So with respect to the -- final

13    question.  This question of a stay has risen here.  If you

14    win, he will appeal and seek a stay.  If he wins, I assume

15    maybe the same, although it would have been joined.  Maybe the

16    selection or maybe we have got to talk about that as a

17    separate issue.  But what is your view on that; on the stay to

18    let this go up or down to Richmond?

19            MS. NELSON:  I think a stay is -- Plaintiff would

20    consider that a win, and the damage to the State and all

21    current applicants would be just as significant as if they had

22    met their burden on any of the criteria required for

23    demonstrating that they are entitled to a temporary

24    restraining order.

25            There have been very blunt references in other cases

 1   about tactics and whether timing is carefully designed to

 2   exert maximum pressure on the state.  Here, Maryland created a

 3   licensing process where no one has a guarantee to a license.

 4   That is the lottery.  Everyone can qualify for entry into the

 5   lottery, but nobody is guaranteed a license in the lottery.

 6              THE COURT:  Does it say how many licenses are given

 7   out?

 8              MS. NELSON:  There are statute limits.  The State

 9   will not give away all licenses in this first licensing round,

10   but it does specify.  This round, the State intends to award

11   up to 179 licenses and to conduct individual licenses for each

12   license category in each region.  So --

13              THE COURT:  Okay.  Continue.

14              MS. NELSON:  -- many aspiring small business owners

15   who have already made their initial investment in putting

16   together a business plan and an operational plan and pursuing

17   opportunities for funding and pursuing opportunities for

18   locations would be in limbo pending further judicial action.

19   And the harm to the State would be the same.

20              THE COURT:  Yes.  It would essentially give to the

21   same outcome even --

22              MS. NELSON:  It would.

23              THE COURT:  -- in losing as you would in winning, I

24   guess.

25              MS. NELSON:  It would, Your Honor.

1          THE COURT:  Well, if we get to that, I would

2    probably ask for a little bit more briefing on that question,

3    but that is maybe down the road.

4          Thank you very much.  Unless there is anything else,

5    I am going to give him the last word, and then we will all be

6    on our way.

7          MS. NELSON:  Thank you.

8          MR. JENSEN:  Thank you, Your Honor.  I would like to

9    begin with Laches.  The State continues to speak out of both

10   sides of their mouth on this.  They say that we should have

11   challenged it back in May when the program was put out, but

12   they say that we have no standing even today even though we

13   applied in November and were not permitted to go onto the next

14   round.  So if the State is saying that we don't have standing

15   even today because we didn't submit a registration that we

16   were not permitted to submit, how could we possibly challenge

17   the law in May?

18         And I want to also point out, Your Honor, you know,

19   where in California, we don't file every jurisdiction and that

20   is reasonable.  We find out about these things when an

21   industry newsletter or something similar says an application

22   program has opened.  So we were transparent with the Court.  I

23   don't know exactly when, but my experience is that there would

24   have been a newsletter that says Maryland is open, and that is

25   what would have first alerted to us.  And so our best guess is

1    that probably would have happened in September, but it

2    certainly would not have happened in May.

3              THE COURT:  And I guess their view is you are a

4    little bit different than the average plaintiff in that it is

5    clear you are very active in this world, and perhaps, the

6    insinuation is you should know, but May, June, July, August,

7    September.  I don't know.  I think the issue is more about --

8    in my mind, it is what did you do in September, not so much

9    what did you do in May.

10             MR. JENSEN:  Well, that is fair, Your Honor, but in

11   September, I would, you know, point out that, you know,

12   however many months that is, pretty short for a litigation.  I

13   would also point out again that they are saying that we don't

14   have standing.

15             THE COURT:  Fair enough.

16             MR. JENSEN:  So they complain that we haven't proven

17   that we could have submitted a complete application because we

18   didn't submit an operation diversity plan.  So, you know, we

19   have alleged we have could, which is all that I think is

20   required at this point.  I would like to point also that we

21   had no ability to submit that.  They didn't give us the

22   registration link to submit it.

23             And they are also pointing out -- I mean, they are

24   arguing that these diversity plans and the operational plans

25   is oh, there is something difficult.  They are not.  They are

1    things that people submit along with applications.  The

2    Defense has said that there are --

3              THE COURT:  Plus, I guess your sophistication as an

4    entity involved in this business might be helpful on this

5    point.

6              MR. JENSEN:  Well, Your Honor, I can do you one

7    better.  They have said that the public record shows that

8    Justyna was involved in applications going back to 2019.  The

9    public record will show that she submitted diversity plans and

10   operation plans in those programs --

11             THE COURT:  That makes sense to me.

12             MR. JENSEN:  -- in 2019.

13             THE COURT:  In that sense, it is a benefit.  Maybe

14   not so much in Laches, but at least in this question of ready

15   and able.

16             MR. JENSEN:  Right.

17             THE COURT:  I have got you.

18             MR. JENSEN:  Right.  I am not sure how important

19   this point is, but the Defense said that this is different

20   because it is an individual applying, not a company.  In Lowe

21   it was an individual, not a company.  That is in Detroit.  And

22   many of them -- also in the Sacramento, there were both.  It

23   was the company and the individual.

24             THE COURT:  It is great when we talk about this

25   individual versus company, wouldn't there be a stronger

jj

```
 1   argument from out-of-state schools that this is a Dormant

 2   Commerce Clause violation.  Like, for example, if Cal State

 3   Long Beach, which I think is the school that you presented; is

 4   that right?

 5          MR. JENSEN:  Yes.

 6          THE COURT:  Good baseball, right?

 7          MR. JENSEN:  I can't say I follow that, Your Honor.

 8   Sorry.

 9          THE COURT:  Either way.  Wouldn't they have a better

10   argument?

11          MR. JENSEN: I don't think they have any argument at

12   all.  They are not going to receive a license, ----.

13          THE COURT:  Okay.  Is that what it is?  Because they

14   wouldn't be in the market?  Their graduates are disadvantaged.

15   I don't know how attenuating this can get.

16          MR. JENSEN:  I don't see how you have third party

17   standing there.

18          THE COURT:  Okay.

19          MR. JENSEN:  If you are an association, you can have

20   --

21          THE COURT:  Yes.

22          MR. JENSEN:  -- third party.  If you are a union --

23   what we have to remember is I don't see a college.

24          THE COURT:  College on behalf of his alumni or

25   something like that.
```

1          MR. JENSEN:  They are not even students, right?

2          THE COURT:  Yes.

3          MR. JENSEN:  Because they have to be two years.

4          THE COURT:  That is true.  They are not even alums.

5   They just have to be present.  So anyway, that is an aside,

6   and fortunately, not in front of us.  But if it was, you are

7   all over it.

8          MR. JENSEN:  The Defendants also said that Justyna

9   should have registered in the portal because you could do it

10  before, I guess, you were -- why would she do that?  I would

11  like to know how many people do that.  How many people started

12  a portal before the registration period began?  Because it

13  wasn't like a 24-hour period.  You had time.

14         Not even as a matter whether she was rejected, I

15  would be curious to know how many people went in and started

16  setting up profiles for application programs that aren't even

17  open.  I don't know why you would do that.

18         THE COURT:  Doesn't that data that the State

19  provided on the actual number of applicants for the third

20  prong -- using the third prong as the qualification for social

21  equity verification certification, does that help you?  Hurt

22  you?

23         MR. JENSEN:  Does not make the slightest bit of

24  difference.  They can't say I have these constitutional things

25  over here, so ignore my unconstitutional thing over here.

1   They have an unconstitutional program.  How many people were

2   or were not allowed into it doesn't change ----.

3           THE COURT:  But what is only unconstitutional -- in

4   that regard, it is base.  If I am at tier two and I looking at

5   balancing things or I am trying to determine if it is just a

6   de minimis effect, is that de minimis?

7           MR. JENSEN:  Because, Your Honor, there is a case

8   from the Fourth Circuit that said you don't just get a harm

9   report.  You look at the harm of interstate commerce.  How

10  many people from other states didn't apply?  How many people

11  didn't go into it?

12          You know, the Defense said that it is reasonable to

13  think that the Maryland people are most interested in Maryland

14  licenses.  Okay.  But there are operators all over this

15  country that are trying to gather as many licenses in as many

16  jurisdictions as they can.  That is why I am here.

17          THE COURT:  No, I know one.

18          MR. JENSEN:  Well, true.  But New York was very

19  transparent that they set up their program to keep multi-state

20  applicants out.  The whole purpose of that is to block out-of-

21  staters, and if they didn't mean to do that, they wouldn't

22  have had to put the in-state limitation.

23          THE COURT:  Okay.

24          MR. JENSEN:  I have several more points.

25          THE COURT:  Yes.  Go for it.  Go ahead.

1          MR. JENSEN:  Some of my notes are not clear, even to

2    me.

3          THE COURT:  I am looking at my own and take your

4    time.

5          MR. JENSEN:  The tier two Pike analysis, I believe

6    the Court asked do we need to wait and see how many people got

7    licenses.  No, the tier two Pike analysis, you don't have to

8    get the outcome.  The issue is the law.  What burden is the

9    law putting on people who want to apply?  So the way for the

10   licenses to be issues has two prongs.  Right.  One is it is

11   after the fact.  So now, the Court has to decide as a matter

12   of equity if you are going to recall those licenses.

13          And second, I don't think that is the answer.  I

14   think the answer is what harm does the law pose, what burden

15   does it pose on out-of-state applicants.  And here, if you

16   went to college in 49 of the 50 states, you are not eligible.

17          The State, I believe, has somewhat changed the

18   justification here in court.  In their papers, they said the

19   justification is to provide students who went to schools that

20   receive -- whether students received government benefits.  In

21   court, they have said that the purpose is to support the

22   schools.  I reject that for a number of reasons.

23          You know, again, as Your Honor pointed out, you can

24   support schools that do that nationwide.  I also point out

25   this is not about the schools.  The schools are not getting

1    licenses.  The individuals or companies affiliated with those

2    individuals get licenses.  So you are not supporting the

3    school by giving out licenses to these people.  And even if it

4    was, it is a one-time or maybe two-time lottery.  This is not

5    a go-forward benefit where people are more likely to attend

6    those schools because of that.

7            THE COURT:  What about that question I have about

8    backward looking analysis here?  That this is a little

9    different than all those other statutes because it is sort of

10   --

11           MR. JENSEN:  So in --

12           THE COURT:  No, go ahead.  You know the question.

13           MR. JENSEN:  In every jurisdiction except one that I

14   am aware of, and I don't progress to know every jurisdiction,

15   but their conviction has a time limit, and it is usually some

16   time before the law.  So you have to have a conviction before

17   the State made it legal.  And I think in some of them, and

18   again, I am doing this a long time in my head, so I don't want

19   to be wrong, but I believe in <u>Sacramento</u> it was like back to

20   2011 or something like that, even though the program was in

21   probably 2021.  So they have quite a bit advance cut-off on --

22   now, I'm thinking it might have been Washington that had such

23   a long cut-off.

24           THE COURT:  But then like, for example, that L.A.

25   case had --

1              MR. JENSEN:  Yes.

2              THE COURT:  In the court, they find that that was

3    actually okay; that part of the statute?  The part that said

4    you can have no prior conviction because it was essentially --

5    the criminal justice process was open to all?

6              MR. JENSEN:  Yes.  I mean, there was a previous case

7    in Los Angeles called Arma One*, which was settled on equal

8    protection grounds.  It never got there, but the judge at that

9    time in the tentative order put that same thing about well,

10   you could come on vacation and get arrested.

11             And so then we had an oral argument on that.  The

12   lawyer pointed out, you know, is that said by Dormant Commerce

13   Clause, that if people happen to come to your place on

14   vacation and happen to get arrested, that is not a -- so the

15   judge took that out.

16             This judge put that in in Los Angeles.  I point out

17   again, that wasn't appealed because it was impliedly appealed

18   because the ultimate conclusion of that was that we are going

19   to stay the case until the pending appeal in the Peridot Tree

20   that Your Honor watched.  So that is on appeal.  That is the

21   best I can say about that, and I would ask the Court to use

22   its own judgment, whether that makes sense that if somebody

23   travels in from out-of-state and happens to be arrested,

24   whether that really makes sense under the Dormant Commerce

25   Laws.

1          THE COURT:  Yes.  I only focus on it because it

2   seems to be the closet analogy to this.  And admittedly, sort

3   of crude one, but --

4          MR. JENSEN:  Well, in <u>Sacramento</u>, you had to be a

5   current or former resident of Sacramento going back from like

6   I think the 1980s until something like 2011 or something.  I

7   forget the exact date.  But that was, again, a prior

8   residence.

9          And the vast majority of these are residents within

10  a window.  Certain places like Washington State has a six-

11  month residence before, but Los Angeles does not.  It was you

12  had to be, I believe, 5 out of the previous 10 years or --

13          THE COURT:  Okay.

14          MR. JENSEN:  -- 10 years out of your whole life,

15  something like that.  And that is generally the requirement.

16  Again, with the exception of Washington, I believe most of

17  them have the requirement to be in state at some point.

18          Again, I will point out, you know, the Defendants,

19  again, argue that the Court shouldn't enjoin the whole

20  program.  It should only enjoin the third tier.  The

21  Defendants say on page 11, I believe, of their opposition, the

22  Court can essentially line item detail, which is, I believe,

23  correct.  I did not ask this Court to strike only the third,

24  you know, that to be transparent.

25          THE COURT:  I thought they were referring more to

1   the fact that you were asking for me to take out the state

2   part, which is what I --

3            MR. JENSEN:  No.  I was using it --

4            THE COURT:  -- was reading this as.

5            MR. JENSEN:  -- a hypo that -- I was saying if that

6   happened, and I never asked the Court to do that.  What I said

7   is if the Court enjoins the program, the legislation has the

8   chance then to put in a constitutional program as other states

9   have done.  And in this case, it could be as simple as taking

10  out the words in the state.

11           Again, I think that is the -- I am not aware of any

12  jurisdiction that approached it from the standpoint of let's

13  strike just the offending portion.  All of them, they either

14  enjoin them or they don't, but nobody has ----.

15           THE COURT:  Yes.  But go back to what I said at the

16  beginning when I was making noises to make the point, which I

17  thought all of the statutes, it is sort of you had to take out

18  the whole thing because it was separate dependent clauses if

19  you will.  You had to have this and this and this, so it

20  wouldn't survive if you chopped off one part of this.

21  Whereas, this one seems different.

22           MR. JENSEN:  Well, I am trying to remember back to

23  one particular program, but I won't burden the Court's time

24  with that.  I don't think it makes a difference because I

25  think if part of the law is unconstitutional, it is

1    unconstitutional.  You don't get to save an unconstitutional

2    law by having two other constitution programs that, by the

3    way, don't even apply to the person who is challenging the

4    law.

5          THE COURT:  Yes.  But that is the part I get.  And

6    this goes back, it is not necessarily standing to me, but it

7    does go back to just the remedy, which is if the State did

8    say, okay.  You know what?  We are just going forward with one

9    and two.  Your client doesn't get the license.

10         MR. JENSEN:  Your Honor, that brings up somewhat --

11   the State is -- by the way, the State quoted a Defendant

12   briefing here.  This wasn't a statement of the Court.  This is

13   a Defendant brief saying that we were somehow acting proper by

14   waiting until the application program.

15         You know, it has gone the other way, right, inn

16   Missouri.  They challenged before an application in Detroit.

17   And the result of that was the states lost the entire program.

18   Or I guess in Detroit, it was a city.  In Missouri, they lost

19   the entire -- so, you know.  This one, if they say only one

20   person has standing, they can solve this right now.  So I

21   think for them to criticize me for not bringing it earlier,

22   they would have lost the entire program.  Here, they can move

23   this right now if they wanted to.

24         THE COURT:  By giving your client a license?

25         MR. JENSEN:  Exactly.  So I don't think that we are

1    acting improperly or placing a larger burden on them because

2    they would lose the entire program.  They would have no choice

3    in that matter because I brought this --

4         THE COURT:  What I should have said, by giving your

5    client the right to enter the lottery?

6         MR. JENSEN:  However you want to say it.

7         THE COURT:  Well, it is your negotiation.

8         MR. JENSEN:  Right.  But, Your Honor, the point is

9    Missouri and Detroit, they had no ability to save their

10   programs because once somebody challenged on the front-end,

11   anybody could do that afterward.  Even if they tried to settle

12   with that plaintiff, it does nothing for them.

13        THE COURT:  I guess their point is just if you had

14   brought this earlier, we would have been having this --

15        MR. JENSEN:  If I brought this --

16        THE COURT:  -- way back before they spent a nickel

17   other than on --

18        MR. JENSEN:  If I had brought this earlier, they

19   would have lost the entire program.

20        THE COURT:  Maybe, but they wouldn't have spent

21   $650,000, and that is just the dollar cost on, you know, their

22   end.  I don't even know what the cost to the people who did

23   submit applications would be.  They obviously had to go

24   through something in order to put together the application,

25   and now, we know there are some 1,900 individuals at least.

1              MR. JENSEN:  But this --

2              THE COURT:  So there is a lot of -- there is

3    additional costs in excess of 650,000, at least as far as I

4    see because that is just the State's cost.  Am I right?

5              MR. JENSEN:  If this were a racial challenge, do you

6    think they would say that because they spent $650,000, they

7    can exclude a certain race?

8              THE COURT:  Well, it is not a race challenge, so we

9    don't even need to get into that.

10             MR. JENSEN:  Well --

11             THE COURT:  But my point -- yes.  I mean, putting

12   the -- I am not going to weigh which parts of the constitution

13   are more important.  I see your point though.

14             MR. JENSEN:  Right.  And as far as the other costs,

15   I mean, there is a $5,000 writer application fee.  It was paid

16   to the Defendants.  They can return that.

17             THE COURT:  Yes.  I mean, I see your point is that

18   the -- I think, is the violation of the constitution is

19   priceless.  Like, we can't say, okay, it only costs this much

20   or it costs this much.  But I think taking -- in every

21   argument where Latches is raised, there's probably a

22   significant violation or at least a perceived violation.

23             The point as I see it is just, we are now literally

24   a week or two away from the rollout of the lottery, which has

25   cost a significant amount of money to the State, and I would

1    say to all the applicants.  And that ignores sort of the sweat

2    equity part of it.

3              MR. JENSEN:  Your Honor --

4              THE COURT:  If this could have been brought back

5    when you first learned about it, and I get it.  You are saying

6    the State is talking out of both sides.  I totally understand

7    your argument.  I am just saying let's put that aside.  If you

8    could have brought it back then, it would have saved a lot of

9    this.  And that is what I think is the State's overarching

10   point.  And I will look at them and see if I am ignoring --

11   okay.  They are nodding.

12             MR. JENSEN:  Your Honor, we brought this action --

13   this is in the reply, and I am trying to find it, but we --

14             THE COURT:  You know, I understand when it was

15   brought, and that is all part of the record.  I can go back to

16   the briefs and do it.  But I think what is clear is that by

17   your own affidavit, your client was aware and should have been

18   aware that they were excluded in September.

19             And I get it that the State hadn't maybe printed a

20   list of the six qualified schools, but I don't know that the

21   list was necessarily needed.  Even agreeing that you don't

22   have to jump through all the hopes that the State is saying, I

23   still see an issue with waiting.  And I credit the settlement

24   negotiation piece, and it is not necessarily a punishment for

25   that, but it is a delay.

1              MR. JENSEN:  Your Honor, I am --

2              THE COURT:  Not the worst.

3              MR. JENSEN:  -- trying to find this in the brief,

4    and I believe it is on page 12 that it talks about it.  But we

5    filed this lawsuit before the State -- so we filed the lawsuit

6    on I believe the 26th, and they knew it was coming before

7    then.  They knew it was coming since -- I am sorry.  The 26th

8    of January.  They knew it was coming since December.

9              THE COURT:  But it doesn't really matter if they

10   knew when it was coming.  Right.  I mean, doesn't --

11             MR. JENSEN:  But, Your Honor, on February 9th is

12   when they notified applicants that they were eligible or

13   ineligible to apply for the lottery.  So --

14             THE COURT:  But then aren't -- I mean, in some

15   sense, using your phrase, are you talking out of both sides of

16   your mouth when it comes to that?  Because you knew you were

17   ineligible in September.  I am not hearing anything or reading

18   anything in the pleadings that reflects that there was ever a

19   debate over whether your client would qualify or not.  It was

20   obvious she wouldn't.

21             And so you could have filed back then, said all the

22   things you said here.  I have an established participant in

23   the marijuana market.  She understands the system.  She is

24   licensed in these places.  She is ready and able.  Here is my

25   declaration, but she can't because she doesn't qualify as a

1   social equity applicant under this section.  Court, please

2   figure it out for me.  We could have done that back in

3   September.  I think that is my point.

4          MR. JENSEN:  So assuming that we found out in

5   December, which I think is reasonable.

6          THE COURT:  I would say September.  I thought

7   September was --

8          MR. JENSEN:  Yes.  I mean, I --

9          THE COURT:  You said December.

10          MR. JENSEN:  Well, no.  It had to be before December

11   because we applied in November.  You know, I did not want to

12   be under -- I didn't want to say we found out November

13   because, you know, I don't know.  So I am going to assume it

14   is -- September is a reasonable time because that is when it

15   opens.  That is probably when we had the paper.  So I am going

16   to assume it is September.

17          All right.  If that is the fact, you know, all of

18   the --

19          THE COURT:  Well, let's just stick to your affidavit

20   because that is the --

21          MR. JENSEN:  Right.  So the affidavit said -- I

22   don't remember exactly when, so I am going to say September is

23   likely because that is when the program opened, I believe.

24          THE COURT:  Okay.  I can find it in here.

25          MR. JENSEN:  Your Honor, my point on that is if I

 1   were to make a number that advantaged me, it would not be

 2   September.  I would say November.  So if anything, it would be

 3   an over inclusive in that.

 4            THE COURT:  Well, I mean, it is the truth.  I don't

 5   think you are over inclusive or under.  Whatever it is is what

 6   is in the affidavit.  I am going to assume that is the truth.

 7            MR. JENSEN:  Right.  And the truth, as we put in the

 8   affidavit, is to the best of our memory, it would have come in

 9   through reading a newsletter that it opened.  So that is the

10   one who started all this.

11            THE COURT:  Okay.

12            MR. JENSEN:  So okay.  So let's take September.  You

13   know, every one we have done, we have applied and gotten a

14   rejection for standing, to mooting the standing issue.

15   Notwithstanding that that happened here.  I am still facing a

16   standing issue because they're arguing otherwise.  So I don't

17   think September was the right time for us to apply.  I think

18   the right time was after we were rejected, and that is what we

19   did.

20            THE COURT:  And you were rejected in?

21            MR. JENSEN:  December 13th.

22            THE COURT:  And you filed?

23            MR. JENSEN:  Well, December 13, I was rejected.

24   December 27th, I contacted them about a settlement.  In

25   January, I believe, 26th, is when we filed.

1              THE COURT:  And I know that seems like reasonable

2     timeframes under the normal world of litigation.  I mean, I

3     might even say they are quick, but given that it was

4     advertised, I thought that the licenses were going to be

5     distributed in February.  It seemed to require a bit of a

6     quicker pace.

7              MR. JENSEN:  They have not held the lottery yet.  To

8     my knowledge --

9              THE COURT:  Well, I know they haven't.

10             MR. JENSEN:  -- they have months.

11             THE COURT:  But I think when you applied, and maybe

12    I am making facts up now, but I thought when you applied,

13    there was some knowledge of when the lottery would take place.

14             MR. JENSEN:  Your Honor, I think that all of this is

15    fair game.  If they are going to point to my knowledge, I

16    think it is fair to point to their knowledge that they have

17    not even -- as far as I know, they have not even announced the

18    date of the lottery yet.  They certainly know there are

19    challenges here, so I think that is fair game.

20             THE COURT:  All right.  Fair enough.  Well, thank

21    you both.  I really appreciate the time and effort.  My plan

22    is to try and get something out like early next week.  This

23    issue of whether there needs to be a stay or not, I would

24    probably invite a little bit further discussion on that, just

25    in paper if necessary.  So we will address that whenever I put

1   something out.  My hope is to get it out by early next week,

2   but I appreciate the time and effort everybody took to put

3   this together and the arguments today.  Thanks a lot.

4           THE CLERK:  All rise.  This Honorable Court now

5   stays adjourned.

6       (Whereupon, at 11:32 a.m., the hearing concluded.)

jj

## C E R T I F I C A T E

I hereby certify that the foregoing is a correct transcript from the duplicated electronic sound recording of the proceedings in the above-entitled matter.

/s/ Jana Jordan  4/17/2024

Jana Jordan                    Date
Transcriber, CompuScribe